UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEVEN WEBSTER, <br><br> Petitioner, <br><br> v. <br><br> DEAN GRAY, <br><br> Respondent. | ) <br> ) <br> )    **Civil Action No.** <br> )    **19-11788-FDS** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

# MEMORANDUM AND ORDER ON
# PETITION FOR A WRIT OF HABEAS CORPUS

**SAYLOR, C.J.**

This is a petition for a writ of habeas corpus. Petitioner Steven Webster is an inmate at the Souza-Baranowski Correctional Center. Dean Gray is the current superintendent of that facility.

In 2016, Webster was convicted by a jury of first-degree murder and other related charges. He was sentenced to a term of life imprisonment and now seeks habeas relief pursuant to 28 U.S.C. § 2254. His petition alleges that insufficient evidence was presented at trial to support a guilty verdict and that his continued incarceration violates his right to due process.

For the following reasons, the petition for a writ of habeas corpus will be denied.

**I.    Background**

    **A.    Factual Background**

The following facts are taken from the opinion of the Massachusetts Supreme Judicial Court ("SJC"). *See Commonwealth v. Webster*, 480 Mass. 161, 162-66 (2018).

On July 11, 2012, the victim, Andrew Stanley, was shot and killed in his Hyannis home

during an armed robbery and home invasion. *Id.* at 162. At approximately 1:20 p.m., police responded to reports of gunfire from the victim's address. *Id.* Arriving on the scene, the officers heard moaning and yelling coming from the house. *Id.* One officer saw a man he recognized as Keiko Thomas peer out a window. *Id.* The officers then heard gunfire and saw three men flee the house, one of whom an officer recognized as Eddie Mack. *Id.* The officers gave chase, apprehending Thomas, Mack, and another individual, David Evans. *Id.* During that time, a witness saw a fourth man run back toward the victim's house. *Id.* That man eluded arrest. *Id.*

The police found the victim unresponsive on the floor, his arms and legs bound with duct tape and zip ties. *Id.* He had been beaten, and there were "marks on his body consistent with the use of a stun gun." *Id.* He died from a gunshot wound to the torso. *Id.*

Several pieces of evidence were recovered from the crime scene. After finding Mack hiding beneath an air conditioning unit outside a nearby store, police discovered marijuana inside the air conditioning unit and $14,300 in cash beneath an adjacent pallet. *Id.* at 162-63. Police also found four cell phones in the surrounding area—two from under the pallet and two from a nearby alley. *Id.* at 163. Of those four cell phones, one each belonged to Mack, Thomas, and the victim. *Id.*

Investigators found Mack's fingerprints on a piece of duct tape and his palm print on a window at the victim's house. *Id.* The police also executed a search warrant for Thomas's house, located approximately one mile from the crime scene. *Id.* There, they found a roll of duct tape, handcuffs, and a round of ammunition. *Id.*

The police recovered from a parking lot beside the victim's house a backpack containing two guns (including a loaded .45 caliber Colt handgun), gloves, a stun gun, an aerosol can, and

duct tape consistent with that used to bind the victim.  *Id.*  The Colt handgun was consistent with both a shell casing recovered by police and the bullet retrieved from the victim's body.  *Id.*  Also in the backpack was a black face mask with traces of Webster's deoxyribonucleic acid (DNA).  *Id.*

In the subsequent investigation, police examined the defendants' cell phone records for the days leading up to the murder.  The records showed frequent exchanges of calls and text messages:  Webster called or messaged Evans 231 times between July 1 and the day of the murder, July 11.  *Id.*  Webster also communicated with Mack seven times between July 10 and July 11.  *Id.*  Communications were frequent between the other defendants, too.  From July 7 to July 11, Mack and Thomas exchanged 45 calls and texts.  *Id.*  Mack and Evans communicated multiple times during that period.  *Id.*

On July 3, Webster sent Evans a message that said, "Got some heat lined up."  *Id.*  Webster messaged Evans again on July 7:  "cuz if you chillen im bout, I am to go snatch my lil heat by Norfolk and cum back."  *Id.*  On July 8, Mack messaged Evans:  "Gotta come down so I can explain it better bro so we can get better understandin feel me."  *Id.*  On July 9, Evans messaged Webster asking, "So what about mack?"  *Id.*  Webster responded, "We out their what time was u tryna head out their?"  *Id.*  Evans asked, "what you trying to do?"  *Id.*  Webster replied, "stressing fam."  *Id.*  On July 10, Mack messaged Evans: "Yal good?"  *Id*.  Evans responded "Yup. We out there tomorrow night cuz."  *Id.*  On the morning of July 11, Webster did not message either Evans or Mack, although both were communicating with each other until 12:10 p.m.  From 12:10 to 2:21 p.m., approximately an hour before and after the murder, none of the defendants messaged each other.  *Id.* at 165.

The police also examined cell site location information (CSLI), which placed Webster's

3

phone in the vicinity of Barnstable on July 10 and 11. *Id.* at 164.[1] An hour after the murder, both Webster's and Evans's phones were tracked moving from Barnstable toward Boston. *Id.*[2] At 2:21 p.m., Webster called Mack's phone "using a calling feature to block the caller's identification." *Id.* Moments later, Mack received a message from Evans's phone that read, "What up bro its [me, Webster] hit me back." *Id.* By 4:00 p.m., Webster's and Evans's cell phones were in the vicinity of Boston. *Id.*

At the victim's house in Hyannis, police discovered tire impressions consistent with the tires of a Chevrolet Impala rented by Evans prior to the murder. *Id.* Police later found the Impala on July 13 in Boston, about a mile from Webster's home. *Id.* Webster's DNA was discovered in the car. *Id.*

The police arrested Webster in February 2013. *Id.* In the police interview following his arrest, Webster told police he had never been to Cape Cod, was unfamiliar with Barnstable, and did not know Evans. *Id.* at 166. Webster later admitted to knowing Evans by a street name but claimed to have met him only once. *Id.*

### B. Procedural Background

Webster was charged with first-degree murder on a theory of felony murder, armed robbery, home invasion, armed assault in a dwelling, and carrying a firearm without a license. *Id.* at 162. In September 2016, he was tried alongside Eddie Mack before a jury. *Id.* at n.2.[3] Webster argued at trial that he had not been present at the crime scene. *Id.* at 164. Nevertheless,

---

[1] Hyannis is a village located within the town of Barnstable.

[2] Evans was in police custody by this time.

[3] Eddie Mack was convicted of murder in the first degree with extreme atrocity and cruelty, among other related charges. Keiko Thomas and David Evans pleaded guilty to manslaughter and other charges.

4

a jury convicted him of all charges. *Id.* at 162.[4]  The trial judge sentenced Webster to a term of life imprisonment for the murder.  He was also sentenced to minimum terms of 25 years for home invasion, 25 years for armed assault in a dwelling, and four years and six months for carrying a firearm without a license, all to run concurrently with the life sentence.

Webster appealed his conviction to the Supreme Judicial Court on the grounds that (1) there was insufficient evidence to convict him; (2) the judge should have excluded the tire impression evidence; (3) the Commonwealth did not sufficiently show that one of the phone numbers introduced at trial belonged to Evans; and (4) the judge should have provided a "consciousness of guilt" instruction to the jury or, alternatively, that Webster's counsel was ineffective for not requesting such an instruction. *Id.* at 164.  He also requested that the SJC grant relief based upon its extraordinary powers under state law to review convictions of capital crimes. *Id.* at 171-72; *see* Mass. Gen. Laws. ch. 278, § 33E.  The Supreme Judicial Court affirmed the trial court judgment and declined to invoke its statutory authority to alter that judgment. *Webster*, 480 Mass. at 171-72.

## II.   Standard of Review

Under 28 U.S.C. § 2254(d), a federal court may not issue a habeas petition "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state court decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state-court decision is "contrary to" clearly established federal law if it (1) "applies a

---

[4] The trial court judge then dismissed the armed robbery conviction contingent upon the murder conviction being upheld. *Webster*, 480 Mass. at 162 n.1.

rule that contradicts the governing law set forth in [the Supreme Court's] cases" or (2) resolves a case differently from the Supreme Court on a set of "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). In either scenario, the state-court decision must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to Supreme Court precedent. *Williams*, 529 U.S. at 405.

A state-court decision involves an "unreasonable application" of federal law if the state court identified the correct governing legal principle from the Supreme Court's decisions but applied it in an objectively unreasonable manner. *See Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (citing *Williams*, 529 U.S. at 409). The Supreme Court has cautioned that "[a]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410. The state court's application of federal law must be "more than incorrect or erroneous." *Lockyer*, 538 U.S. at 75 (citing *Williams*, 529 U.S. at 410, 412); *see also Teti v. Bender*, 507 F.3d 50, 57 (1st Cir. 2007) ("A decision can still be reasonable even if the reviewing court thinks it is wrong; 'unreasonable' here means something more than incorrect or erroneous."). Furthermore,

> if it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application . . . [S]ome increment of incorrectness beyond error is required. The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court.

*McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (internal citations and quotation marks omitted).

### III.  Analysis

Webster contends that the evidence at trial was legally insufficient to support his felony-murder conviction. He alleges that no rational trier of fact could have found beyond a

reasonable doubt that he was present at the crime or participated as a joint venturer. In support of those arguments, he points to a lack of forensic or physical evidence linking him to the crime scene and the circumstantial nature of the evidence upon which the Commonwealth relied.

Challenges to the sufficiency of the evidence on direct review require courts to ask "whether, after viewing the evidence in light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).[5] Reasonable inferences that may be drawn from the evidence must also be viewed in light most favorable to the prosecution. *Morgan v. Dickhaut*, 677 F.3d 39, 47 (1st Cir. 2012) (quoting *United States v. Andujar*, 49 F.3d 16, 20 (1st Cir. 1995)). For a federal habeas petitioner, the applicant must overcome a standard of review that is "twice-deferential." *Parker v. Matthews*, 567 U.S. 37, 43 (2012). The petitioner must show (1) that the evidence introduced at trial fell short of the standard articulated in *Jackson* and (2) that the state court unreasonably determined otherwise. *See, e.g., Linton v. Saba*, 812 F.3d 112, 123 (1st Cir. 2016) ("a state court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was objectively unreasonable'" (quoting *Parker*, 567 U.S. at 43)). "Unreasonable" means that the decision "evinces some increment of incorrectness beyond mere error." *Winfield v. O'Brien*, 775 F.3d 1, 8 (1st Cir. 2014) (quoting *Leftwich v. Maloney*, 532 F.3d 20, 23 (1st Cir. 2001)).

Under Massachusetts law, to convict a defendant of felony murder with armed robbery as the predicate felony, the Commonwealth is required to prove beyond a reasonable doubt that the

---

[5] In assessing the sufficiency of evidence, Massachusetts courts employ a standard set forth in *Commonwealth v. Lattimore*, 378 Mass. 671 (1979). The First Circuit has held that standard to be "functionally identical" to that articulated by the Supreme Court in *Jackson v. Virginia*. *Logan v. Gelb*, 790 F.3d 65, 71 (1st Cir. 2015). Therefore, when the Supreme Judicial Court reviews for *Lattimore* error, it simultaneously "answer[s] the federal constitutional question." *Roman v. Mitchell*, 924 F.3d 3, 6 n.1 (1st Cir. 2019) (quoting *Housen v. Gelb*, 744 F.3d 221, 225 (1st Cir. 2014)).

defendant was involved in an armed robbery and that the victim's death occurred "in the commission or attempted commission of that robbery." *Commonwealth v. Williams*, 475 Mass. 705, 710 (2016) (internal quotation marks omitted).[6]  A conviction for armed robbery requires proof that the defendant was armed with a dangerous weapon, applied actual force to the victim, and took the victim's property with the intent to steal it. *See id.* at 710.  To convict a defendant as a joint venturer of a crime, the Commonwealth must prove that he "knowingly participated in the commission of the crime charged, alone or with others, with the intent required for the offense." *Commonwealth v. Rakes*, 478 Mass. 22, 32 (2017).

On direct review, the SJC determined that a reasonable jury, based on the evidence presented, could have found Webster guilty of the charged crimes:

> [T]aken together, the evidence, including the text messages in which the defendant said he was procuring a firearm, the CSLI evidence placing his cell phone in the area of the victim's home on July 11 and tracking it as the defendant made his way from Barnstable to Boston just after the murder, his cell phone silence on the morning of the murder, his attempts to conceal his identity when he contacted Mack using Evans's cell phone after the murder, the fact that Evans could not have driven his rental car back to Boston right after the murder, the condition in which the victim was discovered, and the cash and marijuana recovered, as well as the DNA and the defendant's false statements to police was sufficient to allow the jury to conclude that the defendant knowingly participated in a joint venture to commit home invasion, armed assault in a dwelling, armed robbery, and carrying a firearm without a license.

*Commonwealth v. Webster*, 480 Mass. 161, 167-68 (2018) (footnote omitted).  The evidence also permitted a reasonable jury to infer that the victim was "killed in the course of the armed robbery, thereby providing sufficient evidence to find the defendant guilty of felony murder." *Id.* at 168.

---

[6] In September 2017, the SJC eliminated common-law felony murder as an "independent theory of liability for murder," and "prospectively narrowed" the felony-murder rule so that "a defendant may not be convicted of murder without proof of one of the three prongs of malice." *Commonwealth v. Brown*, 477 Mass. 805, 807 (2017).  Because Webster's conviction predates the SJC's decision in *Brown*, the new rule does not apply to this case.

Webster argues that the SJC's determination was unreasonable because "[n]o one actually saw [him] in or near the scene of the killing." Pet'r's Mem. at 31, ECF 19. He contends, among other things, that no witnesses or forensic evidence link him to the crime scene. *Id.* at 32. But Webster's objections frame the relevant question incorrectly. The relevant question is not whether there was sufficient evidence to prove his presence, but whether there was sufficient evidence to convict him as a joint venturer of an armed robbery in which the victim was killed. A state-court conviction resting on dual theories of guilt survives habeas review "as long as one of the two theories is adequately supported." *Leftwich v. Maloney*, 532 F.3d 20, 24 (1st Cir. 2008). Thus, proof that Webster was at the scene of the crime is not strictly necessary to uphold his conviction, although evidence of his presence obviously would be probative of his contributions as a joint venturer.

Webster further argues that his conviction as a joint venturer was based on "nothing more than speculation." Pet'r's Mem. at 38. He contends that although the evidence may be consistent with his participation in the crime "in some unspecified manner," it is also consistent with him accompanying the other defendants to Cape Cod while being unaware of their criminal plan and elsewhere during the crime. *See id.* at 39. He proposes several innocent explanations for the Commonwealth's evidence—for example, that he had traveled to Cape Cod to go shopping or visit a girlfriend. *Id.* He argues that there is no evidence that he drove the Chevrolet Impala or rode in it by himself, *id.* at 37; that the CSLI evidence fails to place him at the crime scene with sufficient precision, *id.* at 40-41; that the text messages sent before the murder are "inconclusive," *id.* at 40; and that the message sent from Evans's phone afterward is innocuous and fails to tie him to the crime, *id.* at 38. In essence, he argues that the evidence arrayed against him is either amenable to innocent interpretation or the result of coincidence.

9

The SJC acknowledged that Webster's conviction relied on circumstantial evidence. *Webster*, 480 Mass. at 167. Nevertheless, "a criminal conviction may be supported by circumstantial evidence alone." *Gomes v. Silva*, 958 F.3d 12, 20 (1st Cir. 2020). And this principle applies with greater force when considering the deference afforded to state-court decisions under habeas review. *See Magraw v. Roden*, 743 F.3d 1, 6 (1st Cir. 2014). It matters not whether the evidence is susceptible to a "plausible alternative interpretation," but whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Morgan*, 667 F.3d at 53 (quoting *Jackson*, 433 U.S. at 319). Courts may not "second guess a jury's verdict where it has chosen a reasonable interpretation of the evidence before it." *Id.* at 54.

In this case, the Commonwealth presented sufficient evidence from which a reasonable jury could infer Webster's guilt as a joint venturer. He sent text messages where he discussed getting a gun and meeting with Mack and Evans. *Webster*, 480 Mass. at 163. Viewed within the context of the number of calls and messages between defendants and the content of those communications, the text messages suggest his involvement in a criminal plan for which he planned to furnish a firearm. *See id.* at 165. The CSLI evidence placed him in the vicinity of the robbery and murder, and his DNA was found on a mask located in a backpack containing the murder weapon and other instruments of the crime. *Id.* All defendants ceased communicating by cell phone immediately prior to and after the crime, suggesting all were present together.[7] *Id.* A fourth man, seen by a witness, escaped capture at the scene, and CSLI

---

[7] Webster argues that the absence of text messages "neither supports nor disproves" the theory that he participated in the crime. Pet'r's Mem. at 41. It is true that a conviction cannot be upheld when there is "equal or nearly equal circumstantial support for a theory of guilt and a theory of innocence of the crime charged." *Morgan*, 677 F.3d at 53-54 (quoting *O'Laughlin*. 568 F.3d at 301). Such is not the case here, though. In isolation, the lack of text messages from the day of the murder may be equally indicative of guilt or innocence, but when considered within the context of the defendants' prior text message patterns, the notable absence of messages could have allowed a reasonable jury to infer the defendants were together when the murder occurred. Moreover, when

evidence tracked Webster's phone moving from Barnstable to Boston in the hours following the murder. *Id.* 165-66.  Webster's DNA was found inside the Chevrolet Impala, which was rented by Evans and had tire treads consistent with markings from the scene. *Id.* at 164.  The Impala was found later a mile from Webster's home.  *Id.*  Finally, the subterfuge employed by Webster in sending messages to Mack, as well as the false statements he made to police upon arrest, could also reasonably be construed as evidence of his shared intent with the other defendants and his consciousness of guilt.  *Id.* at 166.  Considered together—along with the evidence that the victim had been beaten, robbed of cash and drugs, and ultimately shot, *id.* at 162-63—the Commonwealth's evidence was sufficient to allow a reasonable jury to infer Webster's guilt as a joint venturer in an armed robbery that resulted in the victim's death.

The SJC's decision satisfies the standard in *Jackson* because a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 433 U.S. at 319.  The decision does not show an "increment of incorrectness beyond mere error."  *Winfield*, 775 F.3d at 8.  Therefore, insufficiency of the evidence is not an adequate ground for granting habeas relief.

## IV.   Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

**So Ordered.**

Dated:  September 1, 2021

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

---

reviewing the sufficiency of the evidence of state court convictions, the proper analysis is to assess each piece of evidence not in isolation but within the context of the "totality of the evidence." *Id.* at n.7.